**The below described is SIGNED.**


**Dated: July 9, 2013**



**WILLIAM T. THURMAN**
**U.S. Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>**JOSEPH WILLIAM YIM KEALAMAKIA** and **DESIREE M. KEALAMAKIA,**<br><br>Debtors. | **Bankruptcy No. 12-31822**<br><br>**Chapter 7**<br><br>**Chief Judge William T. Thurman** |

### MEMORANDUM DECISION

The matter before the Court is Kealamakia, Inc.'s ("K-Inc." or "Creditor") Motion to Dismiss

the present chapter 7 case of Debtors Joseph and Desiree Kealamakia ("Joseph" and "Desiree" or,

collectively, the "Kealamakias").

The Court conducted a hearing on K-Inc.'s motion on May 9 and 10, 2013, at which hearing

Jeffrey W. Shields appeared on behalf of K-Inc. and John Christian Barlow appeared on behalf of

Debtors. Over the course of those two days, the Court heard argument from counsel and received

into evidence 32 stipulated exhibits. The Court also heard the testimony of Joseph Kealamakia and

received the proffered testimony of Desiree Kealamakia.

1

The Court has carefully weighed the evidence properly before it and has considered the parties' briefs and memoranda, the statutory authority, and case law cited by the parties. The Court has also conducted its own independent research of the law. The Court now issues the following Memorandum Decision, which constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, made applicable to this proceeding by Federal Rules of Bankruptcy Procedure 9014 and 7052.

## I.    JURISDICTION AND VENUE

The Court has jurisdiction over this matter under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue is properly laid in this District pursuant to 28 U.S.C. §1408. Notice of the hearing was proper in all respects.

## II.    BACKGROUND AND FINDINGS OF FACT

The dispute between the parties is not of recent vintage; its origins lie in two real estate transactions in the 1990s. K-Inc. sold a parcel of real property in 1994, and a second parcel in 1997. William and Nadine Kealamakia, parents of Joseph Kealamakia, then officers and directors of K-Inc., converted funds from these sales and transferred a portion to their son Joseph, one of the Debtors herein.[1] These transfers became the subject of state court litigation, in which the Fifth Judicial District Court of Iron County, State of Utah, found Joseph liable for conversion and unjust enrichment in a decision issued July 23, 2007.[2] The state court entered judgment against Joseph in the amount of $50,299.44, which consisted of $36,403.10 in damages and $13,896.34 in interest.[3]

---

[1] Ex. 7.

[2] *Id.*

[3] Ex. 8.

2

The Kealamakias filed a petition under chapter 13 of the Bankruptcy Code on April 28, 2009, Case No. 09-24225 (their "First Case"). Ruling from the bench, the Court dismissed that case on December 2, 2009. Over two years passed, during which time K-Inc. garnished Joseph's wages to satisfy the judgment against him. From May 1, 2010 to March 31, 2012, K-Inc. collected $26,617.68 from Joseph.[4]

Then on April 3, 2012, the Kealamakias filed a petition in this District under chapter 7 of the Code, (their "Second Case") which was assigned case number 12-24156. The United States Trustee determined that a presumption of abuse arose under 11 U.S.C. § 707(b)(2)—the "means test"—and moved to dismiss the case pursuant to 11 U.S.C. § 707(b)(1).[5] The Court granted the United States Trustee's motion by order dated August 16, 2012, wherein the Court noted the Debtors' default.[6] Shortly thereafter, the Kealamakias filed the present chapter 7 case (their "Third Case") on September 14, 2012.

K-Inc. argues that Debtors' Third Case was filed in bad faith and should be dismissed for cause under § 707(a). In support of its motion, K-Inc. makes four principal arguments that seek to establish the Debtors' bad faith. First, the multiple filings demonstrate the Debtors' intent to end the garnishments and avoid paying the debt owed to K-Inc. Second, the Debtors' schedules show that this case  is essentially a two-party dispute between the Debtors and K-Inc. Third, the Debtors are seeking to discharge a debt that arose from wrongful conduct that occurred pre-petition. Fourth, the

---

[4] Ex. 29.

[5] All subsequent statutory references are to title 11 of the United States Code unless otherwise indicated.

[6] Ex. 16.

3

Debtors have engaged in procedural gamesmanship in the filing of this and the other cases. In support of the fourth argument, K-Inc. asserts that the Debtors altered or omitted information from their Schedules in an attempt to manipulate the bankruptcy process.

The Court heard evidence that showed a discrepancy between the number of dependents listed in the Debtors' bankruptcy cases. When the Debtors filed their Second Case in April 2012, they did not list any dependents on their Schedule I.[7] When they filed their Third Case in September 2012, however, four adult dependents appeared on their Schedule I.[8] Joseph testified that he failed to disclose the dependents in the prior case because he was ashamed to admit that he had adult children living at home and because he was confused about whether he could claim adults as dependents on his bankruptcy schedules.

Debtors' Schedule I from the First Case, however, does list five dependents: three minor foster-children, one minor daughter, and one 18-year-old son. Based upon the time that the First Case was filed, it appears that the minor daughter and 18-year-old son may be two of the adult dependents listed in the Third Case.

The Court also heard testimony regarding a purported arrangement between Joseph and one Lane Morgan ("Morgan"). Morgan is a creditor collecting on a loan that Joseph took out to pay the legal fees he and his parents incurred in the state court action. The Debtors did not initially list Morgan as a creditor in the Third Case,[9] but they did list him as a secured creditor in the First Case.[10]

---

[7] Ex. 13.

[8] Ex. 14.

[9] Ex. 6.

[10] Ex. 2.

4

The Debtors amended their Schedule F on April 9, 2013 to list Morgan as an unsecured creditor, but did not list the amount of the claim.[11]

K-Inc. attempted to show that the Debtors did not initially list Morgan in the Third Case because he had asked Joseph not to and because he and Joseph would reach an agreement to pay the debt owed to him. While the testimony was inconclusive regarding whether there was such an agreement, K-Inc. never established that the Debtors were paying Morgan pursuant to an outside arrangement.

## III.    DISCUSSION

A central purpose of the Bankruptcy Code is to "provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"[12] Courts must construe the Bankruptcy Code "liberally in favor of the debtor and strictly against the creditor."[13] Nevertheless, these policies are counterbalanced by the recognition that an opportunity for a fresh start is reserved for the "honest but unfortunate debtor."[14]

*A. The Rooker-Feldman Doctrine*

As an initial matter, the Court must consider K-Inc.'s argument that the *Rooker-Feldman*

---

[11] Docket No. 38.

[12] *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

[13] *Mathai v. Warren (In re Warren)*, 512 F.3d 1241, 1248 (10th Cir. 2008) (citing *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir.1997)).

[14] *Grogan*, 489 U.S. at 287.

5

doctrine bars Debtors from proceeding further in this case. That doctrine prevents a "a party losing in state court . . . from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights."[15]

The Supreme Court further elaborated on the doctrine in the case of *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, where it stated that the *Rooker-Feldman* doctrine occupies a "narrow ground" and noted that lower courts have sometimes extended it "far beyond the contours" of the original cases to which the doctrine owes its name.[16] The Supreme Court held that the doctrine is confined to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."[17]

K-Inc. has argued that the Court should apply the *Rooker-Feldman* doctrine in this case with the same force as it did in the Debtors' First Case. In that case, Debtors listed on their Schedule A a parcel of real property that had been transferred from Nadine Kealamakia to Joseph in violation of the state court's prejudgment writ of attachment. The state court found that the transfer was ineffective and subjected the property to post-judgment execution.[18] The Debtors' Chapter 13 Plan in the First Case proposed to retain the property and strip the judgment lien imposed on it. In so doing, this Court held that the Debtors were trying to appeal the state court's determination that the

---

[15] *Johnson v. De Grandy*, 512 U.S. 997, 1005–06 (1994).

[16] *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283–84 (2005).

[17] *Id.* at 284.

[18] Ex. 24.

property belonged to someone else, which was barred by the *Rooker-Feldman* doctrine.[19]

K-Inc.'s position is that, if the Debtors are allowed to proceed with this Third Case and discharge the state court judgment, they will be in effect retaining the funds transferred to them by William and Nadine Kealamakia, which the state court ruled were not theirs. In sum, permitting the Debtors to discharge that debt would be just as much of a review and rejection of the state court judgment as if the Debtors had been allowed in their First Case to keep the real property and strip the lien from it.

The Court finds the two instances distinguishable. In the First Case, the Debtors were attempting to modify or amend the state court's ruling by retaining the property, which the state court had declared was not theirs. In the Third Case, by contrast, the Debtors are not seeking a review of the state court's judgment against Joseph, nor are they using this Court to challenge the factual and legal determinations made by the state court. All they have sought is to discharge their debts, including that owed to K-Inc. The Court does not believe this is barred by the *Rooker-Feldman* doctrine.

K-Inc. has cited no case that holds that the *Rooker-Feldman* doctrine prevents bankruptcy courts from discharging debts arising from judgments entered against a debtor who has been found liable for conversion or unjust enrichment. This Court's own research did not find such a case. To reach such a holding would over-extend the *Rooker-Feldman* doctrine beyond the narrow ground on which it stands. Such a broad application of the *Rooker-Feldman* doctrine would deny many debtors their statutory right to a discharge under the Code.

Of course, a creditor that comes to bankruptcy court with a judgment in hand ordinarily does

---

[19] Ex. 18.

7

not assert *Rooker-Feldman* at the outset of the case because the Code provides avenues to the creditor to except the specific debt owed to it from discharge under § 523 or to deny the debtor's discharge under § 727. Due to the nature of the state court's findings against Joseph, K-Inc. believes those options are not available to it in this Third Case. This fact does not change the Court's analysis with regard to the *Rooker-Feldman* doctrine, however. Whether K-Inc. could succeed on a § 523 or § 727 action should not shift the focus away from the essential inquiry under the doctrine, which is whether the losing party in state court is seeking appellate review of that judgment. The Court finds that the Debtors are not seeking review of the state court's judgment; they are instead seeking to discharge a debt pursuant to the rights afforded them by the Bankruptcy Code. Therefore, the *Rooker-Feldman* doctrine is not applicable to this case.

### B. Bad Faith Constitutes "Cause" Under 11 U.S.C. § 707(a)

K-Inc.'s motion argues that dismissal of Debtors' Third Case under chapter 7 is appropriate under § 707(a) because the petition was not filed in good faith. The Debtors did not dispute the legal contention that bad faith can constitute cause under that section, but rather argued that the facts presented did not evince bad faith.

The issue of whether bad faith can constitute cause for dismissal under § 707(a) has created a division among bankruptcy courts and circuit courts around the country.[20] On the one hand, the Third, Sixth, and Eleventh Circuits have held that chapter 7 cases can be dismissed for a debtor's

---

[20] *See In re Adolph*, 441 B.R. 909, 911 (Bankr. N.D. Ill. 2011) ("Whether a chapter 7 case can be dismissed on bad faith grounds under section 707(a) is one of the older debates in bankruptcy law.") (citation omitted).

bad faith conduct under § 707(a).[21] On the other hand, the Eighth and Ninth Circuits have held that

bad faith is not a proper basis for a § 707(a) dismissal.[22] Even within the Tenth Circuit, courts have

split on the issue,[23] but the Tenth Circuit Court of Appeals has yet to address this question. Due to

the importance of this issue, the Court will engage in its own analysis before addressing the facts of

this case.

The foundational canon of statutory interpretation directs courts to look first at the language

of the statute itself.[24] Where the statute's language is clear, "the sole function of the courts is to

enforce it according to its terms."[25] With this guidance in mind, § 707(a) provides:

> The court may dismiss a case under this chapter only after notice and a hearing and only for *cause*, including—
>
> (1) unreasonable delay by the debtor that is prejudicial to creditors;
>
> (2) nonpayment of any fees or charges required under chapter 123 of title 28; and

---

[21] *Perlin v. Hitachi Capital Am. Corp. (In re Perlin)*, 497 F.3d 364, 369 (3rd Cir. 2007); *Tamecki v. Frank (In re Tamecki)*, 229 F.3d 205, 207 (3rd Cir. 2000); *Indus. Ins. Servs., Inc. v. Zick (In re Zick)*, 931 F.2d 1124, 1126–27 (6th Cir. 1991); *Piazza v. Nueterra Healthcare Physical Therapy, LLC (In re Piazza)*, — F.3d —, 2013 WL 3198005 (11th Cir. 2013).

[22] *Sherman v. SEC (In re Sherman)*, 491 F.3d 948, 970 (9th Cir. 2007); *Neary v. Padilla (In re Padilla)*, 222 F.3d 1184, 1191 (9th Cir. 2000); *Huckfeldt v. Huckfeldt (In re Huckfeldt)*, 39 F.3d 829, 832 (8th Cir.1994).

[23] *Compare In re Quinn*, 490 B.R. 607 (Bankr. D.N.M. 2012) (holding that a debtor's lack of good faith is relevant in determining whether to dismiss a case under § 707(a) for cause), *and In re Tanenbaum*, 210 B.R. 182 (Bankr. D. Colo. 1997) ("The absence of good faith of a debtor is also sufficient cause for dismissal under Section 707(a)."), *with Shangraw v. Etcheverry (In re Etcheverry)*, 242 B.R. 503 (D. Colo. 1999) (concluding that bad faith is not cause for dismissal under § 707(a)), *and In re Lobera*, 454 B.R. 824 (Bankr. D.N.M. 2011) (same).

[24] *See, e.g., United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989).

[25] *Id.* (citation and internal quotation marks omitted).

9

(3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521(a), but only on a motion by the United States trustee.

(emphasis added). The Bankruptcy Code does not define "cause,"[26] but the list of what constitutes "cause" is not exclusive.[27] Therefore, "the fact that 'bad faith' or a 'lack of good faith' is not included among the enumerated grounds for 'cause' does not unequivocally eliminate bad faith as a basis for finding sufficient 'cause' for dismissal under 11 U.S.C. § 707(a)."[28] Yet there must be some limit to what the word "including" brings into § 707(a), otherwise Congress would have stated that a court may dismiss a case after notice and a hearing for "any reason."[29]

At first glance, the lack of an express inclusion of bad faith in § 707(a) appears to be a strong indication of legislative intent, particularly where Congress provided for a bad faith analysis under another Code section: § 707(b)(3)(A). It is an equally long-standing principle of statutory interpretation that where Congress uses "'particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"[30] Therefore, if Congress had wanted to make bad faith expressly applicable in § 707(a) as it did in § 707(b)(3)(A), it would have done so.

---

[26] *See, e.g.*, *Quinn*, 490 B.R. at 613–14.

[27] Section 102(3) provides that "'includes' and 'including' are not limiting[.]" *See also Etcheverry*, 242 B.R. at 505 ("The instances of 'cause' set forth in Section 707(a) are merely illustrative and are not an exhaustive listing.") (citation omitted).

[28] *Quinn*, 490 B.R. at 614 (citation omitted).

[29] *In re Lobera*, 454 B.R. 824, 841 (Bankr. D.N.M. 2011).

[30] *Bates v. United States*, 522 U.S. 23, 29–30 (1997) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

10

Yet this argument only has force if, when Congress enacted § 707(b)(3)(A), it considered adding bad faith as cause under § 707(a) but deliberately declined to do so.[31] The history of § 707 shows that subsections (a) and (b) were enacted at different times and for different purposes. Section 707 was enacted by the Bankruptcy Reform Act of 1978.[32] It was not until six years later that what we recognize as subsection (b) came into being.[33] Congress added subsection (b) for two reasons: it wanted to (1) "address the problem of consumer debtors taking inordinate advantage of modern easy-credit practices" and (2) "give the courts a specific mechanism to more readily dismiss petitions by abusive consumer debtors."[34] Subsection (b) therefore carved out a particular method of treating certain consumer bankruptcy petitions under chapter 7. It did not "narrow and discourage court review of abuse cases to those involving consumer debt[.]"[35] Instead, its purpose was to "broaden and encourage such review in light of the fact many bankruptcy courts were not dismissing abusive consumer petitions."[36] Therefore, the 1984 amendments to subsection (b) are best interpreted as a

---

[31] *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) ("We do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it.") (citing *United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 836 (2001)).

[32] Bankruptcy Reform Act of 1978, Pub. L. No. 95–598, 92 Stat. 2549 (1978).

[33] *See* Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98–353, 98 Stat. 333 (1984). In pertinent part, § 707(b) provided: "After notice and a hearing, the court . . . may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter."

[34] *Stewart v. United States Trustee (In re Stewart)*, 175 F.3d 796, 812–13 (10th Cir. 1999).

[35] *Id.* at 813.

[36] *Id.* (citation omitted).

11

supplement to, rather than a restriction of, a bankruptcy court's authority under § 707(a).

Two years later, Congress added language to § 707(b) to make clear that the United States Trustee could bring a motion to dismiss under the former version of that section.[37] Then in 2005, Congress made further changes to subsection (b),[38] including adding the requirement that the court consider whether the petition was filed in bad faith.[39] It is inferring too much to conclude that when Congress added an express bad faith inquiry under subsection (b), it meant to remove the same from subsection (a) by its silence alone, especially where "the legislative history to the 2005 Act does not indicate that the modifications to section 707(b) imply anything about the dismissal of bankruptcy cases under section 707(a)."[40] The history of subsections (a) and (b) shows their different purposes and scope; the codification and subsequent refinement of subsection (b) is best interpreted not to diminish and confine the applicability of subsection (a).[41]

---

[37]  *See id.* at 804. The subsection read: "After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case . . . [for] substantial abuse."

[38]  *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005).

[39]  Section 707(b)(3)(A) provides:

"In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in paragraph (2)(A)(i) does not arise or is rebutted, the court shall consider—(A) whether the debtor filed the petition in bad faith[.]"

[40]  *Perlin v. Hitachi Capital Am. Corp. (In re Perlin)*, 497 F.3d 364, 371 (3rd Cir. 2007).

[41]  *See also Piazza v. Nueterra Healthcare Physical Therapy, LLC (In re Piazza)*, — F.3d —, 2013 WL 3198005, at *13 (11th Cir. 2013) ("[T]he more reasonable inference to be drawn from Congress's decision not to amend § 707(a) is that bad faith was already clearly encompassed within the ordinary meaning of 'for cause' dismissal.") (citation omitted).

In addition, a different canon of statutory interpretation favors the argument that bad faith constitutes "cause" under § 707(a): "identical words used in different parts of the same act are intended to have the same meaning."[42] Chapters 11 and 13 each contain sections analogous to § 707(a) that authorize dismissal or conversion of a case—whichever is in the best interests of creditors and the estate—for "cause."[43] Like § 707(a), §§ 1112(b) and 1307(c) do not expressly provide that bad faith is a basis for conversion or dismissal. Yet the Tenth Circuit has interpreted § 1307(c) to include bad faith as cause for conversion or dismissal.[44] The Third, Seventh, and Ninth Circuits have joined in the same result.[45] Courts have also held that bad faith conduct can constitute cause to dismiss a case under chapter 11.[46] Moreover, the Supreme Court has recognized that bankruptcy courts "routinely treat dismissal for prepetition bad faith conduct as implicitly authorized by the words 'for cause.'"[47] Therefore, an interpretation of "cause" under § 707(a) that includes bad

---

[42] *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (citations and internal quotation marks omitted).

[43] *See* §§ 1112(b) and 1307(c).Chapter 12 also has a parallel provision, § 1208(c), which authorizes dismissal, though not conversion, upon a finding of "cause."

[44] *See Gier v. Farmers State Bank of Lucas, Kan. (In re Gier)*, 986 F.2d 1326, 1329 (10th Cir. 1993) (joining the Seventh Circuit in concluding that a bad faith inquiry under § 1307(c) must consider the "totality of the circumstances"). *See also Armstrong v. Rushton (In re Armstrong)*, 303 B.R. 213, 218 (B.A.P. 10th Cir. 2004) ("Lack of good faith in commencing a case is 'cause' for dismissal of a Chapter 13 case under § 1307(c).").

[45] *See In re Lilley*, 91 F.3d 491, 496 (3d Cir.1996); *In re Love*, 957 F.2d 1350, 1354 (7th Cir.1992); *In re Eisen*, 14 F.3d 469, 470 (9th Cir.1994).

[46] *See, e.g., In re Quinn*, 490 B.R. 607, 615 n.8 (Bankr. D.N.M. 2012) (collecting cases).

[47] *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 373 (2007).

13

faith is in harmony with interpretations of parallel Code sections.[48]

Nevertheless, not a few courts have advanced the argument that § 707(a) can be distinguished from its parallel provisions in chapters 11 and 13 by the post-petition relationship between a debtor and his creditors as well as by the remedies uniquely available to a chapter 7 creditor. For example, in reorganization cases, debtors are permitted to keep their assets in exchange for renewing their relationships with creditors in good faith.[49] By contrast, in liquidation cases there is no ongoing relationship between debtors and their unsecured creditors.[50] This difference between chapter 7 on the one hand and chapters 11 and 13 on the other suggest that "the ability to discharge should be made available to any [chapter 7] debtor that is willing to risk the chance that some of its debts may not be discharged."[51] In addition, creditors in a chapter 7 case have tools at their disposal to deny a debtor's discharge under § 727 if they believe that the debtor has engaged in conduct that would amount to bad faith.

While these differences are relevant considerations, "the absence of an ongoing *post*-petition relationship between the debtor and creditor in Chapter 7 does not in any way suggest a debtor's *pre*-petition bad faith can never provide 'cause' to dismiss."[52] Therefore, this Court finds that, consonant

---

[48] *See, e.g., In re Pedigo*, 329 B.R. 47, 50 (S.D. Ind. 2005) ("We see no reason to justify interpreting § 1307(c) as permitting dismissal for bad faith and interpreting the parallel provision of § 707(a) to reach the opposite result[.]").

[49] *Neary v. Padilla (In re Padilla)*, 222 F.3d 1184, 1193 (9th Cir. 2000).

[50] *Quinn*, 490 B.R. at 616.

[51] *Shangraw v. Etcheverry (In re Etcheverry)*, 242 B.R. 503, 506 (D. Colo. 1999).

[52] *Piazza v. Nueterra Healthcare Physical Therapy, LLC (In re Piazza)*, — F.3d —, 2013 WL 3198005, at *7 (11th Cir. 2013).

14

with interpretations of analogous Code sections in different chapters, and based upon an examination

of the history of § 707, bad faith does constitute cause for dismissal under § 707(a).

In reaching this conclusion, however, this Court reads bad faith narrowly. Those courts that

have found that bad faith constitutes cause for dismissal under § 707(a) recognize restrictions on a

court's discretion to find bad faith. The Third Circuit has stated that a court should not lightly infer

a lack of good faith and that dismissal is warranted "only in 'egregious cases that entail concealed

or misrepresented assets and/or sources of income, lavish lifestyles, and intention to avoid a single

large debt based upon conduct akin to fraud, misconduct, or gross negligence.'"[53] The Bankruptcy

Court for the District of New Mexico has placed two limitations on a court's bad faith inquiry under

§ 707(a): dismissal for cause may not be based exclusively or primarily on a debtor's (1) "substantial

financial means or ability to repay creditors," or (2) "conduct that forms the basis for objections to

discharge under 11 U.S.C. § 727 or objections to dischargeability of particular debts under 11 U.S.C.

§ 523."[54] This Court agrees that dismissal on the ground of bad faith should be reserved for truly

egregious cases.

In addition, the bad faith inquiry is by necessity a fact-intensive process that requires

"consideration of all the facts and circumstances surrounding the debtor's filing for bankruptcy."[55]

---

[53]   *Perlin v. Hitachi Capital Am. Corp. (In re Perlin)*, 497 F.3d 364, 373 (3rd Cir. 2007)
(quoting *Indus. Ins. Servs., Inc. v. Zick (In re Zick)*, 931 F.2d 1124, 1129 (6th Cir. 1991)).

[54]   *Quinn*, 490 B.R. at 616–618. *See also In re Glunk*, 342 B.R. 717, 733 (Bankr. E.D. Pa.
2006) ("If other provisions already embedded in the Code are up to the task of ensuring the
proper functioning of the bankruptcy system, there is no reason to invoke the narrow doctrine of
dismissal for lack of good faith.").

[55]   *Perlin*, 497 F.3d at 372. *See also Piazza*, — F.3d —, 2013 WL 3198005, at *15
(endorsing the totality of the circumstances test for examining a debtor's bad faith).

Dismissing a case for a debtor's bad faith "must be undertaken on an *ad hoc* basis."[56] This may involve determining in each individual case where a debtor's petition falls on "the spectrum ranging from the clearly acceptable to the patently abusive."[57]

      This fact-specific approach comports with the bad faith analysis the Tenth Circuit has employed in the chapter 13 context.[58] Therefore, consistent with this Circuit's bad faith analysis under parallel Code sections and also with other courts' bad faith analyses under § 707(a), this Court will examine the Debtors' conduct using the totality of the circumstances.

### C. Debtors' Petition Was Not Filed in Bad Faith

      The factors relevant to a totality of the circumstances test can vary depending on the context.[59] Although the parties made passing reference to *Flygare* and *Gier*, they elected to analyze the good faith of the Debtors under the case of *In re O'Brien*.[60] In that case, which is persuasive, but not controlling authority, the Bankruptcy Court for the Western District of New York concluded that bad faith is cause to dismiss a chapter 7 case under § 707(a). The court then listed fourteen factors,

---

[56]  *Zick*, 931 F.2d at 1129.

[57]  *Perlin*, 497 F.3d at 372 (quoting *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3rd Cir. 2004) (Chapter 11 case)).

[58]  *See Gier v. Farmers State Bank of Lucas, Kan. (In re Gier)*, 986 F.2d 1326, 1329 (10th Cir. 1993) (adopting the totality of the circumstances test for determining bad faith under § 1307(c)).

[59]  *Compare Flygare v. Boulden*, 709 F.2d 1344 (10th Cir.1983) (discussing eleven factors relevant to a § 1325(a)(3) inquiry), *with Gier v. Farmers State Bank of Lucas, Kan. (In re Gier)*, 986 F.2d 1326, 1329 (10th Cir. 1993) (discussing seven factors relevant to a § 1307(c) inquiry). *See also In re Tomasini*, 339 B.R. 773 (Bankr. D. Utah 2006) (comparing good faith standards under two different Code sections).

[60]  *In re O'Brien*, 328 B.R. 669 (Bankr. W.D.N.Y. 2005).

16

set forth in the case of *In re Keobapha*,[61] to examine when determining "whether a debtor's filing

was in bad faith or good faith."[62] Those 14 factors are:

> (1) The debtor reduces creditors to a single creditor in the months prior to the filing of the petition; (2) The debtor failed to make lifestyle adjustments or continued living an expansive or lavish lifestyle; (3) Debtor filed the case in response to a Judgment pending litigation...; (4) The debtor made no efforts to repay his debts; (5) The unfairness of the use of Chapter 7; (6) The debtor has sufficient resources to pay his debts; (7) The debtor is paying debts to insiders; (8) The schedules inflate expenses to disguise financial well-being; (9) The debtor transferred assets; (10) The debtor's overly utilizing the protections of the Code to the unconscionable detriment of creditors; (11) The debtor employed a deliberate and persistent plan of evading a single major creditor; (12) The debtor failed to make candid and full disclosure; (13) The debts are modest in relation to assets and income; and (14) There are multiple bankruptcies or other procedural "gymnastics."[63]

Other courts have used these factors in part or in whole.[64] Without expressly adopting the factors

enumerated in *O'Brien*, this Court finds that they constitute a comprehensive and appropriate totality

of the circumstances test for analyzing bad faith under § 707(a). The Court will therefore examine

the Debtors' conduct using those factors.

 First, the Debtors did not reduce their creditors to a single creditor in the months leading up

to the petition date. While K-Inc. argued that its debt has always predominated, the evidence does

not show that the Debtors reduced  their creditors prior to filing. While the debt to K-Inc. is

substantial, the Debtors also listed a mortgage claim for over three times the amount of K-Inc. debt.

---

[61] *In re Keobapha*, 279 B.R. 49 (Bankr. D. Conn. 2002).

[62] *O'Brien*, 328 B.R. at 675.

[63] *Id*.

[64] *See Blumenberg v. Yihye (In re Blumenberg)*, 263 B.R. 704, 715 (Bankr. E.D.N.Y. 2001) (using six-factor test); *In re Lombardo*, 370 B.R. 506, 511–12 (Bankr. E.D.N.Y. 2007) (citing fourteen factors); *In re Glunk*, 342 B.R. 717, 733 (Bankr. E.D. Pa. 2006) (condensing the fourteen *Keobapha* factors down to five).

The Debtors' Schedules also show an automobile loan and various unsecured debts totaling $21,197.[65]

Second, the Debtors have not failed to make lifestyle adjustments. While K-Inc. argued that the Debtors' lifestyle has not changed, Joseph's testimony revealed a different picture. He stated that he lost his car and is in the process of losing his house. He has cancelled his cable TV service, terminated his gym pass, and is now driving his son's car. When asked whether he dines out, he responded that he could not afford it. The Debtors' lifestyle cannot be described as expansive or lavish.

The Debtors did admit that they filed bankruptcy in response to litigation, at least with respect to the First Case. While this factor is not fatal to the Debtors' case, it does count against them.

With regard to the fourth factor, the Court finds that the Debtors have made efforts to repay their debts. K-Inc. emphasized that Joseph has not paid the judgment voluntarily and that K-Inc. has had to recover the money owed to it through garnishment. However, Joseph testified that he called his uncle Thomas, who is currently a principal with K-Inc., in an attempt to settle the debt with it, but his attempts were rebuffed. This shows some effort on the Debtors' part to repay the debt. In addition, Joseph has paid $26,617.68 from May 1, 2010 to March 31, 2012 towards the debt.[66] While these payments were through wage garnishment, it is undisputed that Joseph was paying the debt to K-Inc.

The Court does not find that the Debtors' use of chapter 7 for this Third Case is unfair. The

---

[65] Ex. 6.

[66] Ex. 29.

18

Debtors are in a worsening financial condition, as evinced by the loss of the Debtors' car and the imminent loss of their house. Meanwhile, the debt to K-Inc. continues to grow through the accumulation of interest and legal fees. The filing of the Third Case is in accord with one of the purposes of the Bankruptcy Code—to offer the debtor a fresh start.

Regarding the sixth factor, the evidence suggests that the Debtors do not have sufficient resources to pay their debts. They have lost a car and are losing their house because they are no longer able to make payments on the debts owing on those assets. K-Inc. has used these facts to argue that the loss of these assets indicates that the Debtors were living above their means until the circumstances forced them to trim sail. Moreover, K-Inc. argues that the garnishment of Joseph's wages for over two years shows that the Debtors had and still have the ability to repay the debt. The sixth factor encompasses all of the Debtors' debts, however, not just the debt to K-Inc. The evidence before the Court demonstrates that the Kealamakias had to surrender collateral securing some of their debt, and this evidence is enough to find that they do not have sufficient resources to pay their debts.

The Court cannot find any evidence that the Debtors are paying debts to insiders. K-Inc. argued that Joseph's agreement to pay Lane Morgan counts as a payment of a debt to an insider because the ultimate result was to pay for the legal fees incurred by Joseph's mother during the state court litigation. K-Inc., however, did not introduce evidence that such payments were being made.

With regard to the eighth factor, K-Inc. argues that the Debtors inflated their expenses to disguise their financial well-being by adding their four adult children as dependents. K-Inc. questioned the adequacy of Joseph's explanation as to why his adult children were not listed as dependents in the Second Case, but were listed in the Third Case. While Joseph's explanation was unusual and not particularly convincing, the assertion that the addition of the children as dependents

19

disguises the Debtors' financial well-being is belied by the loss of their home and car. From the evidence presented, it appears the Debtors are not well-off.

As to the ninth factor, there was little or no evidence presented concerning transfers of assets, so the Court finds this factor is not at issue in this case. There was substantially more evidence presented regarding the tenth factor, overutilization of the Code to the unconscionable detriment of creditors. It is undisputed that the Debtors have filed three cases in under four years and that the first two were dismissed within months after they were filed. However, the Court is reluctant to conclude that these filings constitute an overutilization of the Code that has caused creditors to suffer unconscionably. As the Tenth Circuit has acknowledged, multiple bankruptcies in close succession "are not per se evidence of bad faith."[67]

The Court does not find that the Debtors have employed a single a deliberate plan of evading K-Inc. Even if the Debtors have fought K-Inc. over the state court judgment, Joseph has paid $26,617.68 towards satisfaction of that debt. From the evidence presented about the Debtors' current financial circumstances, it appears that the present bankruptcy case is filed more out of genuine need than out of a desire to evade K-Inc.

Regarding the twelfth factor, the Court finds that the Debtors' disclosures have not been completely full and candid. They did not list any dependents in their Second Case, but listed four adult children in their Third Case, which was filed in the same year as the Second Case. Joseph explained the discrepancy by asserting first that he was ashamed to admit that he had four adult children living with him and second that he did not know he could list them on his Schedules.

---

[67] *Gier v. Farmers State Bank of Lucas, Kan. (In re Gier)*, 986 F.2d 1326, 1329 (10th Cir. 1993).

20

The Court does not attach much weight to Joseph's first explanation. Even if he was ashamed to list his adult children on his Schedules, that concern  was apparently of insufficient strength or duration to prevent him from listing them on his Schedules in the Third Case. In addition, his second explanation is contradicted by the Debtors' Schedule I in the First Case, which lists an 18-year-old son.

The Debtors also initially failed to list Lane Morgan as a creditor in the Third Case because Morgan asked the Debtors not to schedule him. While there was no evidence presented that the Debtors have been making payments to Morgan outside of the bankruptcy case, the failure to list him cannot be overlooked. In sum, the Debtors' failures to disclose are problematic, and the twelfth factor weighs against the Debtors.

Whether one's debts are modest in relation to his assets and income is not a bright-line inquiry. The Debtors' Summary of Schedules lists $262,150 in assets and $399,703 in liabilities. The scheduled liabilities do not include the K-Inc. debt, which K-Inc. asserts now stands at $116,952.74. In addition, Joseph's W-2s from 2009-2012 show a decline in income from $85,500 in 2009 to $60,500 in 2012.[68] Joseph testified that his pay has been reduced further since he filed the present case. He now receives gross income of $2,250 every two weeks, which when multiplied by 26, yields gross annualized income of $58,500.

K-Inc. introduced evidence that tended to contradict Joseph's decline in income, however. The schedule of garnishments shows that the amount garnished from Joseph's wages remained largely constant—and even rose slightly at times—from May 2010 to March 2012.[69] If the

---

[68] Ex. 3.

[69] Ex. 29.

percentage of Joseph's wages being garnished remained steady, an increase in the amount garnished would suggest that his wages were rising because under Utah law garnishments are a percentage of the income of the garnishee.

However, the most significant drop in Joseph's income occurred between 2009, when he earned $85,500, and 2010, when he earned $66,250. This drop is not captured by the schedule of garnishments. He earned $66,000 in 2011, nearly the same amount he earned in 2010. Joseph then earned $60,500 in 2012, which would likely trigger a reduction in the amount garnished, but the six garnishments in 2012 show that the amount for the first four did not change from 2011 and the last two rose by $1.78. Nevertheless, the drop in Joseph's wages in 2012 could have occurred after the garnishments stopped in March. Further, the garnishment schedule does not capture the latest reduction in Joseph's income, to which he testified at the hearing. While the evidence regarding Joseph's income is not entirely clear, based on the evidence as a whole, the Court cannot conclude that the Kealamakias' debts are modest in relation to their income.

The last factor inquires into whether there have been multiple bankruptcies or other procedural gymnastics. The Debtors have filed three bankruptcies since 2009. In addition, it appears that the inclusion of the four adult dependents on Schedule I in this case was an attempt to pass the § 707(b)(2) means test that resulted in the dismissal of the Debtors' previous case.

Based on the totality of the circumstances, the Court finds that the Debtors' petition was not filed in bad faith such as to warrant dismissal of the case for cause under § 707(a). The entirety of the Debtors' financial picture shows a family with a mounting debt burden and decreasing income. The dire straits in which the Debtors find themselves have been shown by the loss of their car and the imminent loss of their house.

The Court is concerned about the Debtors' previously dismissed cases, their history with K-Inc., and their failure to make full disclosures on their Schedules. But the Court finds that these facts do not rise to a level sufficient to dismiss the case. Under the totality of the circumstances, the Court determines that the Debtors' petition, while not at the far end of the "clearly acceptable" end of the spectrum, is closer to that end than the "patently abusive" end. This is not an egregious case where the Debtors have concealed assets or income, nor is it a case where the Debtors have continued to live a lavish lifestyle while proceeding through bankruptcy. The Court also finds that the Debtors' case does not show an intention to avoid a single large debt based upon conduct akin to fraud, misconduct, or gross negligence.

## IV.    CONCLUSION

The Kealamakias had a judgment entered against them, which has continued to grow through the accumulation of interest and fees. While this debt has contributed substantially to their financial distress, it is far from the only reason they filed for bankruptcy. The Debtors have shown a genuine need for the protections of the Code. Their prosecution of this case and their prior cases has not been without blemishes. However, the Court does not find cause to dismiss the Debtors' case on the facts before it.

Therefore, K-Inc.'s motion to dismiss should be denied. A separate order will accompany this Memorandum Decision.

_____END OF DOCUMENT_____

_____**ooo0ooo**_____
**SERVICE LIST**

Service of the foregoing **MEMORANDUM DECISION** will be effected through the Bankruptcy Noticing Center to each party listed below.

Jeffrey W. Shields
Blakely J. Denny
SNELL & WILMER L.L.P.
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, UT 84101
     *Attorneys for Kealamakia, Inc.*

John Christian Barlow
LAW OFFICE OF JOHN CHRISTIAN BARLOW
444 East Tabernacle Street B-201
St. George, UT 84770
     *Attorney for Debtors*

Joseph William Yim Kealamakia
Desiree M. Kealamakia
174 N. Sunnyside Drive
Cedar City, UT 84720-2226
     *Debtors*

Michael F. Thomson tr
DORSEY & WHITNEY LLP
136 South Main St., Suite 1000
Salt Lake City, UT 84101
     *Chapter 7 Trustee*

Office of the United States Trustee
Ken Garff Bldg.
405 South Main Street, Suite 300
Salt Lake City, UT 84111